UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GRAHAM MANNING, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No. 13-10506-FDS |
| METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY, a wholly owned subsidiary of Metlife, Inc., | ) ) ) ) ) | |
| Defendant. | ) ) ) | |

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action for gender discrimination arising from the firing of an employee. Plaintiff Graham Manning was employed as a senior claims adjuster by defendant Metropolitan Property and Casualty Insurance Company ("MPC") until May 15, 2012. He alleges that defendant engaged in discriminatory conduct in violation of Massachusetts law by firing him because of his gender.

Defendant has moved for summary judgment, contending that it fired plaintiff because he violated a company policy, not because he is male. Plaintiff contends that he was fired because of his gender and that defendant's stated reason is a pretext.

For the following reasons, defendant's motion for summary judgment will be granted.

**I.     Background**

The following facts are undisputed unless otherwise noted.

**A.     Manning's Employment**

Metropolitan Property and Casualty Insurance Company is a corporation engaged in the sale of insurance products for homes, automobiles, and other property. (Def. SMF ¶ 1). It is headquartered in Warwick, Rhode Island. (*Id.* at 2). From August 20, 2000, until May 15, 2012, MPC employed Graham Manning as a claims adjuster in its office in Lowell, Massachusetts. (Pl. SMF ¶¶ 1-2; Def. SMF ¶ 3).[1]

From 2010 through 2012, Manning consistently received good performance reviews from his supervisors at MPC. (Pl. SMF ¶ 3; Wilgoren Aff., Exs. 1-4). He received a 10 percent bonus for outstanding work performance during 2011 and 2012. (Pl. SMF ¶ 4; Manning Dep. at 43-44).

**B.     The 2007 Accident and Claim File**

In 2000 or 2001, Manning purchased an automobile insurance policy from MPC. (Def. SMF ¶ 25; Pl. SMF ¶ 11; Manning Dep. at 87).

In December 2007, Manning's pregnant wife was involved in an four-car accident where an uninsured motorist rear-ended her car. (Manning Dep. at 87-89). As a result of her injuries from the accident, she gave birth prematurely. (*Id.* at 88).

Manning filed two uninsured motorist claims against MPC on behalf of his wife and son. (*Id.* at 90). His wife and son each received the full limits of the insurance policy, or $100,000 each, from MPC. (*Id.*).

---

[1] At some point before 2011, Manning was promoted to senior claims adjuster. (Def. SMF ¶ 3).

Following his wife's car accident, Manning believed that MPC could bring a subrogation claim against a separate insurance company. (Manning Dep. at 107-08). He contends that he requested and received permission from his supervisor to contact MPC's subrogation department and inform them of his idea. (*Id.* at 108). After Manning's wife and son were paid the full limits of their insurance policy, Manning had no financial interest in the claim. (*Id.* at 108, 175).

MPC's subrogation department brought suit against the insurance company in New Hampshire, and named Manning as the plaintiff. (*Id.* at 38, 108). Manning first learned of this lawsuit when he received a letter dated January 18, 2011, from the attorney for the defendant in that case. (*Id.* at 38; Wilgoren Aff., Ex. 5).

Manning obtained access to the claim file arising out of his wife's traffic accident on four occasions in 2011: May 17, November 3, November 15, and November 22. (Def. SMF ¶ 26). Manning contends that he accessed the claim file to determine the status of the lawsuit in New Hampshire and obtain contact information for the attorney purportedly representing him in the case. (Thomas Aff., Ex. C).

### C. MPC Policies on Employee Access of Claim Files

MPC has a corporate policy concerning employees who hold insurance policies with the company. (DeCaporale Aff., Ex. A). The policy states that employees "are prohibited from accessing any [c]ompany system for the purpose of viewing, obtaining, influencing, updating, altering or disclosing any information related to a policy service, underwriting, or claims transaction in which they, their family members, friends or co-workers have a personal interest." (*Id.* at 1).

3

MPC also has a protocol that "must . . . be followed when handling any reported claim which involves a friend or relative of a [c]laim [d]epartment employee." (DeCaporale Aff., Ex. B at 1). It states that employees "are strictly prohibited from handling their own personal claims arising from any type of policy issued by the [c]ompany as well as claims presented by their friends and family members." (*Id.*). The protocol also states that it must be followed to avoid any potential or perceived conflicts of interest." (*Id.*). It warns that "[b]reach of this protocol by any employee could result in disciplinary action, up to and including termination of employment." (*Id.* at 2).

MPC requires all personnel working in its claims department to certify on an annual basis their receipt and understanding of the protocol. (Def. SMF ¶ 7). Manning signed the protocol on November 10, 2010, and November 21, 2011. (DeCaporale Aff., Ex. B at 2; Ex. C at 2). Manning also received e-mails on December 3, 2010, and January 18, 2012, from the president of MPC, detailing the policies in MPC's employee protocol. (DeCaporale Aff, Exs. D, E).

### D. MPC's Investigation

In March 2012, MPC conducted a nationwide audit of its electronic claims systems to identify breaches of MPC policy. (Def. SMF ¶ 15). The audit identified 68 MPC employees who had accessed their own claim file or that of a family member. (*Id.* ¶ 16). Those employees included Manning and 13 of his female coworkers in MPC's Lowell office. (*Id.*).

MPC investigators visited the Lowell office and interviewed the 14 employees, asking them to explain the reasons why they accessed the claim files. (*Id.* ¶ 17). Each employee was asked to submit a written statement explaining their actions. (*Id.*). The summaries of each investigation were sent to Leslie Decaporale, the director of the Lowell office. (*Id.* ¶ 18).

4

In his meeting with the investigators, Manning admitted to (1) accessing the claim of his wife and son on multiple occasions, (2) contacting the subrogation unit and suggesting that they pursue a subrogation claim, and (3) downloading a mediation summary from the New Hampshire case from the claim file to his computer. (*Id.* ¶ 27). In his statement to investigators, Manning admitted he accessed the claim file but said he did so only to assist MPC in recovering money and determine if he was still named as a plaintiff in the lawsuit. (Thomas Aff., Ex. B).

Manning also contends that he received permission from his supervisor, Lori Kondek, to access the claim file. (Manning Dep. at 114-116). MPC contends that Manning's supervisors all denied giving him permission to access the claim file. (Def. SMF ¶¶ 32-33).

DeCaporale reviewed the investigation summaries and discussed each case with MPC Assistant Vice President Patrick Meyer to determine the appropriate discipline for the employees. (Def. SMF ¶ 19). They evaluated each employee based on several criteria, including (1) the number of times the individual accessed the claim file, (2) the extent to which the individual attempted to influence the handling of the claim, (3) whether the claim file involved multiple vehicles, and (4) whether the claim could contain sensitive medical information or information protected by the attorney-client privilege. (*Id.* ¶ 20; DeCaporale Dep. at 199).

On May 15, 2012, DeCaporale terminated Manning's employment. (Def. SMF ¶ 23). DeCaporale and Meyer contend that they determined that Manning's conduct warranted termination because (1) he clearly violated protocol, (2) he accessed the claim four times, (3) he attempted to influence the claim by contacting the subrogation unit, (4) the claim involved multiple vehicles and potentially contained medical and attorney-client privileged information,

5

and (5) Manning downloaded information from the claim file onto his computer. (Def. SMF ¶ 36).

E. **Status of Other Employees**

Three other employees in MPC's Lowell office were terminated for accessing claims in violation of MPC policy: Adora Asiamah, Diana Santos, and Susan Whipple. (Def. SMF ¶ 23). They had each accessed a prohibited claim file 66, 14, and 43 times, respectively. (DeCaporale Dep. at 114). The remaining ten employees, listed below, were given final written warnings. (Def. SMF ¶ 23).

1. Lynne Birchett accessed two of her daughter's claim files on two separate occasions. (Docket No. 37, Ex. 13 at 3). One of those files contained medical information on her daughter. (*Id.*). She was issued a final written warning. (*Id.*, Ex. 12 at 7). Two weeks later, she was given a full severance package when she left MPC. (DeCaporale Aff. at 65-66).

2. Line Therrault was a supervisor who accessed her daughter's claim seven times. (Docket No. 37, Ex. 13 at 10). After MPC initiated the investigation, but before she was issued a final warning, Therrault accessed the claim an eighth time. (*Id.*, Ex. 12 at 9). MPC's human resources department recommended that Therrault be terminated. (DeCaporale Dep. at 199). She was instead issued a final written warning. (Docket No. 37, Ex. 12 at 9).

3. Kathleen Agresti accessed two of her own claims on three occasions. (*Id.*, Ex. 13 at 2). None of the claims involved medical or attorney-client privileged information. (*Id.*). She was issued a final written warning. (*Id.*, Ex. 12 at 8).

6

4. Joy Roukes accessed her own claim on one occasion. (*Id.* at 5). She was issued a final written warning. (*Id.*).

5. Catherine Coughlin accessed the claim system on two occasions. (*Id.*, Ex. 13 at 4). She inadvertently created a new claim in her own name and had it voided by her supervisor. (*Id.*). She was issued a final written warning. (*Id.*, Ex. 12 at 11).

6. Maria Ferreira accessed her own claim on two occasions. (*Id.*, Ex. 13 at 6). The file did not contain any medical or attorney-client privileged information. (*Id.*). She was issued a final written warning. (*Id.*, Ex. 12 at 10).

7. Rachel Gregory accessed her own claim on five occasions. (*Id.* Ex. 13 at 5). There was no medical or attorney-client privileged information in the file. (*Id.*). She was issued a final written warning. (*Id.*, Ex. 12 at 2).

8. Sherry Thibeault accessed her own claim on one occasion. (*Id.*, Ex. 13 at 12). The file contained no medical or attorney-client privileged information. (*Id.*). She was issued a final written warning. (*Id.*, Ex. 12 at 4).

9. Monique Rodrigue accessed her own claim on four occasions. (*Id.*, Ex. 13 at 8). Her claim was closed in 2007 and contained no medical or attorney-client privileged information. (*Id.*). She was issued a final written warning. (*Id.*, Ex. 12 at 6).

10. Raquel Henriquez accessed her own claim on four occasions. (*Id.*, Ex. 13 at 7). There was no medical or attorney-client privileged information in the file. (*Id.*). She was issued a final written warning. (*Id.*, Ex. 12 at 3).

### F. Procedural Background

Manning filed this lawsuit on January 4, 2013, in the Massachusetts Superior Court. The complaint alleges that MPC terminated Manning's employment because of his gender in violation of Mass. Gen. Laws ch. 151B, § 4. MPC removed the case to this Court.

MPC has moved for summary judgment, contending that Manning's employment was terminated because he violated company policy. Manning contends that MPC used his violations of company policy as a pretext to fire him because of his gender.

## II. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotations omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the non-moving party. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id*.

at 256-57.

## III. Analysis

Plaintiff alleges that defendant discriminated against him because of his gender in violation of Mass. Gen. Laws ch. 151B. Under Chapter 151B, it is unlawful "[f]or an employer, by himself or his agent, because of . . . sex [or] gender identity, . . . to discharge from employment [any] individual or to discriminate against such individual . . . unless based upon a bona fide occupational qualification." Mass. Gen. Laws ch. 151B, § 4(1).

The SJC has construed Chapter 151B "as containing four elements an employee must prove to prevail on a claim of discrimination in employment: membership in a protected class, harm, discriminatory animus, and causation." *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 39 (2005). In this case, it is undisputed that plaintiff has fulfilled the first two elements; he is in a protected class and he suffered harm from the termination of his employment. The dispute therefore centers around the remaining two elements.

Where, as here, there is no direct evidence of discriminatory animus and causation, a plaintiff "can establish one or both by indirect or circumstantial evidence using the familiar three-stage, burden-shifting paradigm first set out in *McDonnell Douglas Corp. v. Green*." *Sullivan*, 444 Mass. at 40. As the SJC has explained:

> First, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff does so, the defendant may rebut the inference of discrimination thus established by offering a legitimate, nondiscriminatory reason for its employment action. Once the defendant does so, the plaintiff may, in the third stage of the proceedings, produce evidence that the defendant's stated reason for its action was not a real one, but rather a pretext. Such evidence allows, but does not compel, the jury to infer discriminatory animus, which is an essential element of a claim under [Mass. Gen. Laws ch.] 151B.

*Haddad v. Wal-Mart Stores, Inc.*, 455 Mass. 91, 97 n.14 (2009).

9

### A. *Prima Facie* Case of Discrimination

Generally, a plaintiff who is terminated establishes a *prima facie* case of discrimination by producing evidence that he or she (1) is a member of a class protected by Mass. Gen. Laws ch. 151B, (2) performed the job at an acceptable level, (3) was terminated, and (4) the employer sought to fill the position by hiring another individual with similar qualifications. *Sullivan*, 444 Mass. at 41. However, strict adherence to these factors is unnecessary. A plaintiff "must simply produce sufficient evidence that the employer's actions, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Trustees of Health and Hospitals of City of Boston, Inc. v. Massachusetts Comm'n Against Discrimination*, 449 Mass. 675, 683 (2007) (internal quotations omitted). In doing so, plaintiff can establish a *prima facie* case by showing that he "was treated differently from another person, known as a comparator, who was not a member of [his] protected class, but who otherwise was 'similarly situated.'" *Id.* at 682 (quoting *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129 (1997)).

According to defendant's records, four female Lowell office employees accessed prohibited claim files an equal or greater number of times as plaintiff, but were given a final written warning. Plaintiff contends that he has established a *prima facie* case because those female employees were similarly situated to him in terms of the number of times they accessed a prohibited claim file. He further contends that defendant's decision to fire him, but not them, was arbitrary and capricious. Defendant contends that even if the decisions were arbitrary and capricious, "courts cannot second-guess or re-evaluate the correctness of personnel decisions taken by the employer absent a showing of discriminatory animus." (Def. Reply at 2).

10

Defendant also contends that there were several differences in how the employees violated company policy that justified the different disciplinary measures.

Plaintiff need not provide evidence of discriminatory animus when establishing a *prima facie* case of discrimination. *See Trustees of Health and Hospitals*, 449 Mass. at 682. He need only show that a similarly situated individual not a member of his protected class was treated differently. *Id.* "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Exact correlation is neither likely nor necessary, but the cases must be fair congeners." *Id.* at 683 (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)). In addition, the initial burden of establishing a *prima facie* case is not intended to be onerous; it "is meant to be a 'small showing' that is 'easily made.'" *Id.* (quoting *Chungchi Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir 2003)).

Plaintiff has shown that female employees who violated defendant's policy more times than he did were not fired. That is enough to establish a *prima facie* case of discrimination that creates an inference of discriminatory animus. *See id.* at 683-84 (plaintiffs established *prima facie* case of discrimination where employer followed different procedures when firing African-American female employees than when firing white male employees; employees were similarly situated despite differences in job performance, qualifications, and conduct).

### B. <u>Legitimate, Nondiscriminatory Reason for Decision</u>

Once a *prima facie* case of discrimination has been made, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the decision to rebut the inference of discrimination. *Haddad*, 455 Mass. at 97 n.14. This burden "is one of production and not

persuasion; [defendant] 'need not prove that the reasons were nondiscriminatory.'" *Sullivan*, 444 Mass. at 51 (quoting *Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 117 (2000)).

Defendant has introduced evidence showing that plaintiff was fired because he violated company policy in a particularly egregious manner. In particular, plaintiff accessed claim files containing medical and attorney-client privileged information, the claim files contained information about multiple vehicles, plaintiff influenced the course of the claim by contacting the subrogation unit about a lawsuit against a third party, and plaintiff downloaded a document from the claim file onto his computer. Defendant contends that although plaintiff accessed a prohibited claim file a fewer number of times than some of the female employees, the other employees were not fired because they did not attempt to influence the course of the claims or download documents from the files.

Defendant has therefore offered a legitimate, nondiscriminatory reason for firing plaintiff sufficient to rebut the inference of discrimination created by his *prima facie* case. *See Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 140 (1st Cir. 2012) (defendant articulated legitimate, nondiscriminatory reason for terminating plaintiff by contending he failed to comply with the objectives and duties of his position); *Gu v. Boston Police Dept.*, 312 F.3d 6, 12 (1st Cir. 2002) (defendants' assertion they hired the most qualified person enough to rebut inference of discrimination in hiring).[2]

C.  **Evidence of Discriminatory Motive**

Once a defendant has given a legitimate, nondiscriminatory reason for an adverse

---

[2] Massachusetts courts routinely cite federal case law when deciding discrimination cases under Chapter 151B. *See, e.g.*, *Trustees of Health and Hospitals*, 449 Mass. at 683.

employment action, the burden shifts to the plaintiff to show that the defendant's nondiscriminatory reason is a pretext for discriminatory animus. *Haddad*, 455 Mass. at 97 n.14. "This may be accomplished by showing that the reasons advanced by [the employer] for making the adverse decision are not true." *Sullivan*, 444 Mass. at 55 (quoting *Abramian*, 432 Mass. at 117). As noted above, defendant contends plaintiff's violations of company policy were worse than those of the employees who were not fired because (1) he accessed prohibited claim files that contained medical and attorney-client privileged information, (2) he influenced the course of the claim by contacting the subrogation department, and (3) he downloaded a document from the claim file to his computer.

Plaintiff contends that both of those reasons are a pretext for discriminatory animus. First, he contends that his access to medical or attorney-client privileged information cannot be the reason he was fired because (a) the medical information concerned his wife or his son, which he was authorized to see; (b) the attorney-client privileged information could not have been kept from him, because the attorney was purportedly representing him; and (c) Line Therrault accessed a prohibited claim containing medical and attorney-client privileged information on more occasions than he did, but was not fired. Second, he contends that he only contacted the subrogation department, and later only accessed the claim files, after he was given permission to do so by a supervisor. He further contends that he had no personal interest in the claim's outcome and was simply trying to help his company recover some of its losses from a third party.

The task of a court in addressing alleged violations of Chapter 151B "is not to evaluate the soundness of [the employer's] decision making, but to ensure it does not mask discriminatory animus." *Sullivan*, 444 Mass. at 56 (citing *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825

(1991)). In *Sullivan*, the plaintiff attacked the process used to select her for termination, arguing that the process improperly relied on subjective and unreliable assessments, compared her to employees it should not have, and failed to compare her to employees it should have. *Id.* The plaintiff in *Sullivan* also contended that her employer's opinions of her job performance were incorrect. *Id.* The *Sullivan* court affirmed summary judgment against the plaintiff, concluding that even if it accepted the plaintiff's criticisms of the reasons for her termination as true, those criticisms "fail[ed] to reveal any hidden animus." *Id.*

Plaintiff's criticisms of defendant's firing policy in this case likewise fail to reveal any hidden animus in this case. Even if those criticisms are correct, they show nothing more than a poor personnel decision by defendant. Plaintiff does not contend that he did not violate the policy. Instead, he contends that his violations of the policy should not have resulted in the termination of his employment because he had good reasons for violating the policy. That is not enough to show that defendant's reason for firing him was a pretext. Moreover, there is no evidence to suggest that defendant's decision to fire plaintiff and retain Therrault was due to their different genders. Indeed, plaintiff admitted at his deposition that he had no facts to support his belief that defendant's management was targeting non-diverse people for termination. (Manning Dep. at 142-43).[3]

Finally, plaintiff contends that he obtained permission from a supervisor to contact the subrogation department and access the 2007 claim file. However, "[w]hen assessing a claim of pretext in an employment discrimination case, a court's focus is necessarily on the motivations

---

[3] Plaintiff did state at his deposition that he believed defendant's diversity initiative played a role in his firing. However, plaintiff "cannot create an issue of material fact simply by stating [his] own unsubstantiated belief that [a] diversity policy led to [his] discharge." *Bissett v. Beau Rivage Resorts Inc.*, 442 Fed. Appx. 148, 153 (5th Cir. 2011) (collecting cases). Plaintiff has provided no evidence that defendant's diversity initiative played a role in the termination of his employment.

and perceptions *of the decisionmaker.*" *Davila v. Corporacion De Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 16 (1st Cir. 2007) (emphasis added). The individuals who made the decision to terminate plaintiff's employment were told he did not receive permission to contact the subrogation department.[4] There is no evidence that any part of the investigation was done in bad faith.

The Court's role in a discrimination lawsuit is not to "second-guess a decision to fire [an employee] . . . regardless of whether, to an objective observer, the decision would seem wise or foolish, correct or incorrect, sound or arbitrary." *Davila*, 498 F.3d at 17 (1st Cir. 2007). Defendant has given a legitimate reason for the termination of plaintiff's employment. Plaintiff has provided no evidence that defendant's firing policy was applied differently to him than his female colleagues, as those colleagues neither attempted to influence the course of the claims they accessed nor downloaded documents from those claims. Plaintiff has also introduced no outside evidence of discriminatory animus in the decision to fire him.

Accordingly, defendant's motion for summary judgment will be granted.

## IV. **Conclusion**

For the foregoing reasons, defendant's motion for summary judgment will be GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor<br>
F. Dennis Saylor IV<br>

Dated: April 14, 2014                             United States District Judge

---

[4] Plaintiff objects to this evidence on hearsay grounds. The statements, however, are not being offered to show that plaintiff did not receive permission to access the 2007 claim file. Instead, they are being offered to illustrate the state of mind of the individuals making the decision to fire plaintiff, and are therefore not hearsay. *See* Fed. R. Evid. 801(c)(2) (defining hearsay as a statement "a party offers in evidence to prove the truth of the matter asserted in the statement.").